in case number 232457 Brandywine Village v. Carlino Brandywine. Good morning, Council. Mr. Duffy. Good morning, Your Honors. May it please the Court, my name is Jeffrey Duffy from the law firm of Baker and Hostetler, and we represent the appellate Brandywine Village Associates. With the Court's permission, I'd like to reserve five minutes, please. Granted. Thank you. Your Honors, this is an antitrust case about supermarket competition. It's centered on a Sherman Act claim over which the federal courts have exclusive jurisdiction. Brandywine Village, our client, was the target of concerted conduct by the defendants designed to clear the field of competition for a planned giant supermarket next door. But the district court here effectively allowed the federal antitrust claim to be decided by the state courts, which have no jurisdiction over such a claim. I want to ask you a question about antitrust injury. So as I understand Hanover, the facts of that case, the defendants tried to stop the plaintiff in that case from building a supermarket. Here we have the opposite. As I understand it, Carlino wanted to build a new supermarket, BVA sought to stop that from happening. Why shouldn't we conclude that BVA is trying to use antitrust law to thwart rather than promote competition? A couple of answers to that, Your Honor. As we alleged, as a matter of fact in the complaint, at any time during this whole saga, which as the court knows has gone on for many years now, Carlino and Giant could have built their development next door on a buy right plan about which Brandywine Village would have had nothing to say. They could have had a supermarket open years ago, but they elected to pursue plans that relied on first trying to undermine Brandywine Village Shopping Center and its tenant supermarket so that there would be no competition when the Giant opened. And that also involved working with the township to engage in condemnation to build a road which will have anti-competitive effects. So the Hanover case applies here to show why Brandywine Village has antitrust standing because it's a case where Brandywine Village as a shopping center is being attacked by the defendants here. Why is that an attack on a competitor versus an attack on competition, as I understand Judge Montgomery Reeves' question? It is an attack on competition, Your Honor, because if you go back to the original state of affairs, there's one supermarket in operation in the relevant market, one called Stauffer's Market at the time. Because of the conduct of the defendants, that eventually drops from 1 to 0. So now there are no supermarkets. That's harm to competition. Everyone now, the consumers, now all have to drive farther away to do their shopping. There was considerable public outcry about this, which we also played in the complaint. Now, that's certainly the state of affairs for some time, but that's the result of the litigation, not the actions, right? I mean, the plan was to replace arguably one competitor with another. No, it's certainly a harm to you as the competitor, but I'm still not seeing how that's a harm to competition. I have to disagree with Your Honor about one point. The vacating of the supermarket space at Brandywine Village was not the direct result of a litigation. It came about because, and this is delving a little bit into the weeds, but the lease to the supermarket space in our shopping center was acquired out of a bankruptcy estate by a grocery wholesaler called CNS. CNS is a major supplier of Giant. CNS knew that Giant had plans to build next door. CNS and Giant communicated with each other about what should happen to the supermarket lease in our center. Now, at the time I'm speaking of, there was an operating supermarket there. He was the sub-lessor. I'm sorry, the sub-lessee. So you have, we're the shopping center. CNS becomes the leaseholder for the space, and there's a supermarket operator already there who's sub-leasing from CNS. Following its extensive communications with Giant, CNS decides at the last minute to non-renew the lease. And therefore, at the end of the lease term, the space goes dark. Did you sue, is CNS sued? We did not sue CNS. We uncovered most of this through the part of discovery that we were able to get through in fits and starts in spite of the many stays through which this case has gone. But that's as far as we were able to get. So in this case, it is a very old case at this point. It's been pending for more than seven years, but no defendant ever answered the complaint. Only vigorous discovery took place in all that time. And so now it comes before this court on Rule 12b-6 motion to dismiss, largely based on post-complaint decisions by the state courts in cases that involve different claims, different parties, different issues. And we had no opportunity to amend once the court made that decision. I think there are, it's very complicated in terms of the facts, but I think it can be simplified into three fundamental errors that require reversal here. First, the court did not apply the correct rules 12b-6 standard because it did not accept as true all of the factual allegations in our complaint, nor did it draw all reasonable inferences in our favor. And I can give specific examples of that. Second, it did not apply the correct standard for evaluating a conspiracy claim under section one of the Sherman Act, which requires the district court to evaluate the trade in a holistic way, not parceling it out into separate components and dealing with each component separately. Third, with respect to the pled conduct that it did analyze, some of which involved petitioning activities such as lawsuits, the district court did not apply the correct standard for the sham litigation exception to Norr-Pennington immunity here. We pled a series of sham proceedings, but the district court used a very different test that applies only when there is an allegation of a single sham proceeding. And that makes a decisive difference in the outcome of the analysis here. So I'd like to give a few examples of ways in which the court did not correctly apply the 12b-6 standard because I think that's the most direct route to the result that we're looking for here. There's an entire section of the amended complaint, which describes what I just described in answer to Your Honor's questions about how Giant worked with one of its wholesale suppliers to ensure that our supermarket space would go dark at a certain point in time. The district court never mentions any of that in its opinion. There's an entire section of the amended complaint describing the defendant's early efforts to buy out our shopping center or to induce us to get rid of our supermarket tenant in some other way by threats or cajolery. The district court never discusses any of that. There's an allegation that Carlino filed a tort case against us in state court for the improper purpose of pressuring us to drop our objections to one of Carlino's land use plans that was in process at the time. A plan, by the way, that was ultimately overturned. We even quoted email correspondence between Carlino and Giant in which they actually admit that that was the purpose for which they brought that tort lawsuit. The district court never mentions this fact. Those allegations alone, we submit, would be enough to state a Sherman Act Section 1 claim against both Carlino and Giant, but the district court never mentioned them in its opinion. The defendants all argue in various ways that there's collateral estoppel arising from various state court opinions that are outcome determinative here. But this is a federal antitrust case at its core, and so it presents issues that were not and could not have been litigated in the state courts. Obviously, no Sherman Act claim was litigated there. No unfair competition claim was asserted or litigated. You're arguing that the district court should have just ignored all of those decisions? No, Your Honor, we don't think that at all. And in fact, we do think that some of the intervening results in the state court actions did change the contours of this case. It effectively mooted some of the requests for relief that were originally in our complaint. And we ourselves actually filed a notice of suggestion of mootness with the district court, spelling out what we think the court had lost subject matter jurisdiction over. For example, we don't think that we are in a position to ask the district court to undo the condemnation, the outcome of the condemnation. We don't think we are in a position to ask the district court for specific performance of easement agreements that the state courts have found have been extinguished in the meantime. And so there are certain requests for relief that have dropped out of the case. We don't dispute that. But the core claims of a Sherman Act violation and unfair competition remain in the case. And we should have an opportunity to take full discovery on those claims, which is what the district court originally decided in 2018 should happen before it then stayed the case for many years. And all the types of fact-intensive issues that these defendants are now raising, bucking one fact from this state court proceeding, another fact from that one, without any actual showing that the elements of collateral estoppel are met, that should all be dealt with at the summary judgment phase in this case. I see my time is up. Thank you. Thank you, counsel. We'll hear you again on rebuttal. Ms. Tobin, I understand that you and your colleagues have agreed to divide argument. You'll be beginning with nine minutes of time. That's correct, Your Honors. Please proceed. Good afternoon, Your Honors. My name is Pamela Tobin. I represent the appellant Carlino East Brandywine, L.P., as well as the individual Waters heirs who once owned both parcels. Judge Montgomery Reeves, you hit the nail on the head with your question, because over 13 years Carlino has been striving since 2010 to build a shopping center, which is by right on a commercially zoned property, and to obtain the necessary permits. And it has been stopped by 13 lawsuits that BVA has brought. Six lawsuits, two in this court, four in state court, five land use appeals, and two appeals of administrative permits, our planning module and our HOP. In this court's handover decision, it was the objector's four lawsuits, as Your Honor correctly pointed out, to prevent the food store from being built that was held to be actionable predatory conduct. Not as in this case the developer's actions to defend itself against the objector's series of lawsuits by moving to intervene in one of them, and to bring a damage action to get this to stop. BVA's attempts to turn Hanover on its head by claiming instead that Carlino engaged in crimes that harmed BVA, when the opposite is true, BVA's 13 lawsuits pales in comparison to the two pieces of litigation that it brings up in its complaint, namely the intervention and the damage suit. Did Carlino raise the antitrust standing issue in the most recent motion to dismiss? No, Your Honor, we did not. But we did rely on our prior motion to dismiss. And Judge Schmeel said in his decision that he would take the motion to dismiss, the preliminary one, on reconsideration. So that was sort of part of it. But our main argument here is that there's a complete nexus in the federal lawsuit between the state court actions and the state court decisions. Because as Mr. Duffy acknowledged in his argument, he was asking the court in his federal lawsuit, stop the condemnation, stop Carlino from filing land use plans, stop Carlino from prosecuting its tort action. Now it says, OK, those claims I'm not going to pursue anymore. But that's the point. His lawsuit in federal court was to stop those lawsuits. So we brought to Judge Schmeel's attention, OK, these lawsuits are happening. He decided to stay the action, which made perfect sense to see how those state actions played out. And in fact, those state court decisions are fully binding on BVA. In the condemnation, BVA had a heavy burden to prove that the township condemned road, condemned land that was not for a public purpose. It was condemning it for a road. That's inherently a public purpose. So BVA necessarily argued in the condemnation that Carlino was behind the condemnation, that Carlino had secret meetings with the township, and therefore led the township to condemn the land. The state courts held there was no collusion, that it was for a public purpose. That very decision went all the way up. The Supreme Court refused to take it on review. So that is a decision that there was no collusion that is completely binding on BVA and eviscerates that claim in this federal lawsuit. BVA says, well, the condemnation was subject to the eminent domain code. And the antitrust claim is subject to the Sherman Act. But there is a common claim to both of them. And that was that Carlino caused the condemnation. Carlino colluded with the township. And that was decided in the state court against BVA. So that claim of predatory conduct is gone. It's been decided. And that was one of the reasons why Judge Schmiel properly dismissed the lawsuit. The other thing is that in BVA's five land use appeals, BVA claims now in this federal court that those land use appeals, that Carlino's plan created traffic issues for BVA Shopping Center and prevented BVA from expanding its food store. In those five land use appeals, in all of them, the township, Common Pleas, the Commonwealth Court, they all decided that there were no traffic issues created by that connector road for BVA Center. That issue is gone. BVA cannot claim that there's predatory conduct based on Carlino's plans. As far as the Nora Pennington argument that BVA makes, it admitted in its briefing that it never asserted anywhere in the complaint that Carlino engaged in a pattern or series of sham petitioning. BVA claims that there were five litigations. Three of them were the land use plans, submitting land use plans. Respectfully, that is not petitioning activity. A landowner has the right under the municipality's planning code to submit plans to develop its own. The second way that became litigation was when BVA brought in objections and took it to the courts. I have a question for you. The district court held that the 2018 land development plan was substantially the same as the prior versions. Can we reach out a motion to dismiss? If so, how? Well, because BVA wants to draw a bubble around the first three plans and says, my complaint stops at that point in time. But it attached to its complaint the MOU. The MOU was between the township and Carlino, and it provided that Carlino had to submit a development plan that was substantially similar to the 2011 plan, which was pending at the time of the MOU. So every plan subsequent to that had to be consistent. That's number one. Number two, when the township condemns the land for the connector road, that means the connector road has to be built in the land that was condemned. So that location is fixed. So now you just have space to put in the same elements that were always going to be part of Carlino's plan, which is the giant food store, some attached retail space, a parking lot, and stormwater management, plus the road. So by definition, they had to be consistent, and they were. And also this court can take judicial notice of the Commonwealth Court decision that affirmed approval of the 2018 plan that said it was substantially similar to the prior plans. And in fact it was, if you look at the decisions. It's all the same elements. So it's important to recognize that land use petitions couldn't, or land use plans could not have been petitioning activity. A zoning board or a planning board can't decide private rights. It had no jurisdiction to determine whether these plans interfered with easements. So that's why BVA brought a lawsuit in state court that said our easements are greater than Carlino's recognizing. And the state courts held again against BVA. So you've got the litigation, the condemnation, the litigation, the land use appeals, and litigation easements that all work against all the claims of predatory conduct that BVA is trying to make in this federal lawsuit. Mr. Duffy brings up this email. The email was between Giant and somebody else. And it said that Carlino brought the damage action to exert pressure on BVA. For an abusive process claim, you have to have an act of extortion. At no time is there an allegation that Carlino said to BVA, give up or we're going to sue you with this damages. Or give up your objections and we'll withdraw the damage action. There is no such threat. There's just this internal email. Your honors, what's left here when you consider all the state court decisions is just a typographical error in a broker's ad that indicated more space in Carlino's project than was in fact the case. And also this argument that CNS, Giant's so-called supplier, failed to renew a sublease when it knew that the subtenant was not going to extend its lease. And it also knew that Giant was planning to build a store next door. So why would CNS want to extend the sublease if it didn't have to? And frankly, BVA never brought that claim up in response to the motion to dismiss. So it's our position that it's waived. Thank you, your honors. Thank you, counsel. Mr. Kampf. Yes, your honor. May it please the court, your honors, Warren Kampf. I represent East Brandywine Township. And if I can use three minutes for my argument, I'd appreciate that. The township was dismissed from this case in 2017. And I'm going to be arguing solely about Parker immunity, essentially. The subject matter in the complaint that brings the township at issue is this connector road and the condemnation of the land that was necessary to build it. The Parker case, the Supreme Court, U.S. Supreme Court case, stands for the proposition that in Sherman Act cases, the state government is immune. And the purpose for that is that governments are often engaged in anti-competitive acts. They have lots of purposes that justify their legislative and administrative actions. And the Supreme Court, interpreting the Sherman Act, granted immunity. Now that doesn't, in Parker, apply to municipalities, local governments. But if you look at the Omni case by the Supreme Court, that does apply immunity to local governments so long as they're acting essentially under the theme and within the rules of clear state policy. And the clear state policy in statute here is the eminent domain code and also the municipality's planning code. The township took this 1.5 acres of land for the purpose of that connector road. And that is clear state policy that they're permitted to do that. If you look at the cases, this court is not supposed to take a searching analysis about whether the township did everything right or wrong in following the state law. But the advantage you have is that, as Ms. Tobin indicated, there have been a dozen cases looking at the condemnation and the land development. And they have all been affirmed on appeal in favor of what the township did. So not only for collateral estoppel purposes, but also for your inquiry looking at whether the township engaged in proper behavior under state law, you have those cases to follow. There was an indication that the conspiracy that's alleged is somehow involving the township and that the antitrust law would impose some kind of liability if conspiracy is proven. The Omni case stands for the proposition that conspiracy allegations or accounts in Sherman Act cases do not apply to local governments or state governments. And then lastly, there is a state law claim for unfair competition. This circuit has certainly said in dicta that as the Sherman Act claim goes on immunity, so go the state law claims. And finally, the township is not a competitor under unfair competition law and should not be found responsible for that. Thank you, Your Honors. Thank you, Counsel. Mr. Reich, we'll hear from you last. Good afternoon, Your Honors. May it please the Court. Kevin Reich, Gibbons PC on behalf of the appellee, the Giant Company, LLC. Dismissal with prejudice of the Sherman Act and unfair competition claims against Giant here was proper and should be affirmed. The complaint here includes 248 paragraphs and is far from bare bones. BVA pled all that it could. It's just that the activity that it pled as to Giant as a matter of law does not constitute antitrust injury, which is fatal to antitrust standing. As to the first activity that pled against Giant, the non-renewal of the lease with CNS, it's well settled under the law that conduct as consistent with permissible competition as with illegal conspiracy does not support a Section 1 claim. The complaint itself here alleges two innocuous, equally plausible explanations for that lease non-renewal. First, CNS' consultant who advised that as a result of Giant's impending entry next door, there should be concern potentially for CNS, number one. Number two was the fact that the tenant, Stauffer's, decided not to pursue its business. With respect to Giant's alleged insistence on the connector road, the harms of the then existing easements, traffic access, prevented expansion of the store site, those are all specific to BVA as a property owner and exist regardless of any intent to harm a supermarket tenant. There's no harm to competition. Finally, with respect to Giant's supposed participation in the condemnation action, that is protected petitioning activity under the Norr-Pennington Doctrine. Handover here is distinguishable. The defendant incumbent monopolist in Handover imposed costs directly on the property developer with whom the new entrant signed the lease. Here, however, the complaint alleges in conclusory fashion that Giant interfered directly with CNS and Stauffer's to ensure non-renewal of the anchor lease, not with BVA. Later harm to BVA, if any, was just an ancillary byproduct of that harm, which Handover holds is not enough to plead antitrust injury. And as to Giant's alleged continued insistence on the connector road, harm from that is entirely speculative and premature because the connector road was not and still is not built. No costs, much less direct costs, were imposed on BVA. BVA is neither a customer nor a competitor of Giant, so the only way for BVA to obtain antitrust standing is to apply the inextricably intertwined exception. But applying the inextricably intertwined exception here would essentially swallow the rule by giving every property owner, without regard to whether they're a competitor or a customer in the relevant market, the right to remedy anti-competitive harm to the tenant. That extends Handover far beyond its facts. Because the complaint pleads no harm to competition, the antitrust claim can and should be dismissed at the threshold with prejudice for lack of antitrust standing, just as in Host International, Philadelphia Taxi, and SEI Global. And without a viable Section 1 claim, the unfair competition claim fails as well. Thank you. Thank you, counsel. Mr. Taffey, we'll hear a rebuttal. I think first I'd like to go back to the question that Judge Montgomery Reeves posed. Could the court properly consider the 2018 land use plan on this motion to dismiss and compare it with the three plans that were actually mentioned in the complaint? And our answer to that question is no, it could not. First of all, because it postdates the complaint. It was not before the court in any way. And for that matter, Your Honor, none of the three prior plans were ever before the court either. They were mentioned in the complaint, but the court never was in a position to review them. So the court was not in a position to compare one plan with another and determine what was substantially similar, or what wasn't, or whether something that was anti-competitive in an earlier plan had been remedied in a later plan. And these, again, are disputes of fact, not capable of resolution on a motion to dismiss. I think I would like to address also the significance of the condemnation. We've heard a lot now about how the condemnation is the final word on competition analysis of the planned connector road. But we have three states of affairs. The state of affairs that existed at the time we filed the amended complaint in this case, when the condemnation proceeding was still ongoing. Then the state of affairs when the condemnation proceeding had concluded. But then a third state of affairs, which we haven't heard anything about so far, which was after the condemnation proceeding was over, the township, after a change in the composition of the Board of Supervisors, decided that it did not need everything it had condemned for the stated public purpose of building a road. It passed a resolution to return some of the condemned property and it filed a declaration actually doing so. So the facts relevant to the condemnation have changed since the courts had their final word on whether the township properly exercised its eminent domain power. And when the facts change, and we've cited authority for this in our briefs, collateral estoppel no longer applies. So again, this is a question of fact. The facts have continued to evolve as this case has been pending and during the many years when it was stayed. And so what the district court should have done in this instance and should still do on remand is allow full discovery to go forward, to make a factual record about what is the state of affairs now, and then conduct a proper analysis under the Sherman Act and the other claims that we brought. Did you sue to stay the return of that property? I'm sorry, Your Honor? Was there a suit to stay the return of the property? What happened was that the township through its council, I believe, filed a declaration to affect the return of property. At some point soon after that, the township entered into a comprehensive settlement agreement with my client and other related parties, sort of put an end to both disputes over the fair market value of the property that remained condemned and other disputes that they had between themselves. At that point, Carlito then filed a lawsuit against the township, Brandywine Village, and others to essentially undo that agreement and have the township be ordered to return the property, well, again, I suppose you could say. The Court of Common Pleas granted an injunction. That went up on appeal and the Commonwealth Court vacated the injunction. It went back down. The Court of Common Pleas entered another injunction, granting at least part of the relief Carlito was seeking, and now that's on appeal. So again, we don't know how it's going to turn out. But at the moment, it's a hotly disputed question of fact that the district court here could not possibly do as on Rule 12b6 motion. Unless there are any other questions, Your Honor, I think I'll stop there. Judge Roth, anything further? I think Judge Roth may be muted. Nothing further. Thank you, Counsel. And the case is submitted. Thank you, Judge Roth.